In re Keith D. **RUSSELL,** and Dorothy Russell, Debtors.

Carlos R. **SHANNON** and Linda P. Shannon, Plaintiffs,

v.

Keith D. **RUSSELL,** and Dorothy Russell, Defendants.

Bankruptcy No. 91–14721–B7. Adv. No. 96–90344.

United States Bankruptcy Court, S.D. California.

Dec. 18, 1996.

Laurie E. Wright, San Diego, CA, for Plaintiffs.

Eric C. Hoffland, Noorigian & Associates, San Diego, CA, for Defendants.

### FINDING OF FACT,
### CONCLUSIONS OF LAW,
### *and*
### ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this adversary proceeding, after due notice, trial was held on October 1st and 2nd, 1996, on the Complaint to Determine Dischargeability of Debt filed on May 29, 1996, by the Plaintiffs, Carlos R. Shannon (referred to hereinafter individually as "Shannon") and Linda P. Shannon (referred to hereinafter collectively as "Plaintiffs"), against Debtors/Defendants, Keith D. Russell (referred to hereinafter individually as "Russell") and Dorothy Russell (referred to hereinafter collectively as "Debtors"). The parties appeared through counsel, and each offered the testimony of numerous witnesses, including Shannon and Russell, as well as extensive documentary evidence, including Plaintiffs' Exhibits 1–5, 7–56, 58–63, 65–178, 180–249, 253–271, and 274–276, and Defendants' Exhibits A, B, F, G, I–L, and O–Q.

Plaintiffs litigated whether their claim against Debtors should be excepted from discharge under either the fraud provisions of 11 U.S.C. § 523(a)(2)(A) or the willful and malicious injury provision of § 523(a)(6). Debtors dispute these claims not only as to the substance of the allegations, but also on the grounds that the statute of limitations bars Plaintiffs' fraud claim. At the close of trial, the Court took the matter under advisement and granted the parties 15 days to file briefs in support of their respective positions. Such memoranda having been filed, together with briefs in response and reply, the matter is ripe for disposition. Upon review of the record, the Court finds for Plaintiffs in part and for Defendants in part.

### *FINDINGS OF FACT*

In the fall of 1987, Keith Russell, a licensed realtor since 1984, and Dorothy Russell—the Debtors—purchased a home at 710 Amiford Drive, in the Point Loma area of San Diego County, California, for $400,000. (Exhibit 1). They financed the transaction with a cash down payment, a $320,000.00 first trust deed with Glenfed Mortgage Corp., (Exhibit 50), and a $20,000.00 second trust deed with the sellers, (Exhibit 49). Later, Debtors obtained $80,000.00 from Wells Fargo Bank on an additional deed of trust, dated May 5, 1996, (Exhibit 51), and $22,000.00 on another deed of trust given to a Judith M. Huhn, (Exhibit 39). Finally, Debtors refinanced the loans, executing a $630,000.00 promissory note with Peninsula Bank of San Diego on January 2, 1990, (Exhibit 52), secured by a deed of trust on Debtors' Amiford property, (Exhibit 28), thereby paying off the earlier secured obligations. According to the testimony by Russell on cross-examination at trial, Debtors wound up taking some $250,-000 in loan proceeds out of the property over and above the purchase price they paid of $400,000.00. (Tr. pp. 143–144).

Over the two years following the purchase, Debtors did extensive remodeling on the property, costing in the neighborhood of $200,000. (Tr. p. 57). One of these renovations included installation of a swimming pool. In connection with this installation, at the request of the pool construction contractor, Russell secured and reviewed records of prior building permits obtained by former owners. (Tr. pp. 134–135). These records included a building permit from an earlier owner's foundation repair. (Exhibit 15). This permit reveals that the former owner had done work to reinforce the foundation with four concrete piers. In addition to past permits, the pool contractor also requested Russell obtain soils reports for the lot. (Exhibit 3). Russell said the contractor "wanted to make sure it was a safe place to build a pool." To Russell this meant, "I would consider it safe if it wasn't going to pull out of the ground and fall down on people below," because, as Russell emphasized, "The pool was built in the side of a cliff." (Tr. p. 122).

Russell said he never contacted the author of the soils report directly, also indicating that he did not believe he had ever spoken to the author of the report and that the pool contractor had handled the entire matter. (Tr. p. 121, 136). These statements, however, comport with neither the cover letter of December 7, 1988, addressed to Russell and included with the final report, which states the author conducted the geotechnical investigation "[P]er your request," (Exhibit 3), nor the work order notes of the reports author, which specifically relate a conversation with Russell, (Exhibit 275). In addition, the cover page of the report itself reflects that it was "Prepared for" Russell. (*Id.*). Finally, and most revealingly, the report reads, beginning on the first line of page 2 of the report,

This terrace, which was also at the level of the ground floor, appears to be constructed of both cut and fill. Our understanding, *through conversations with the owner*, is that over fifty years ago, a military armament position was situated at the site, *and the retaining wall and fill were constructed for the installation.* The unretained steeper portions of fill material were covered with ivies and other slope stabilizing vegetation. The overall hillside appeared

to be stable with no signs of surface soil creep, or shallow or deep seated hillside failures. The site was bordered to the north by a similar developed residential property, to the west and south by undeveloped property, and to the east by Amiford Street from which the residence is accessed. (Emphasis added).

(*Id.*) This passage discloses that, contrary to his testimony, not only did Russell have direct contact with the author of the soils report, but Russell knew of the presence of fill soils undergirding the west side of the Amiford property before the soil report was ever prepared.

In addition to the pool installation, Debtors made a number of other renovations and repairs on the inside and outside of the property while they owned it, including replacing damaged sidewalks and concrete flatwork and removing a sidewalk bench accessible to the public that attracted disreputable people. (Tr. pp. 129–130, 133–134). Debtors repairs also included certain plumbing work. One of these instances, involving a stopped up drain line, occurred according to Russell, "about two years after we moved into the house"— approximately late 1989 or 1990. (Tr. pp. 138–139). Debtors discovered this problem, again according to Russell's testimony, when "the shower in the—what's called the maid's room backed up," and "wouldn't drain." (Tr. p. 138). Repair of the problem required pulling back the carpet and excavating a hole in the concrete slab underneath the family room on the lower level of the home. (Tr. pp. 138–139). Debtors then replaced the carpet, covering any evidence of the construction work.

By late summer of 1991, Russell's real estate earnings had declined to the point Debtors could no longer afford the monthly payments on the Peninsula note and the note went into default. Debtors therefore listed the Amiford house for sale. (Tr. pp. 140–141). Although Russell endeavored to market the home, Debtors received no offers from these efforts until the Plaintiffs approached them sometime in late November of 1991. (Tr. pp. 52, 141). After cursory visits to the home on two occasions within

one week, Plaintiffs developed a sincere interest in negotiating purchase of the property. (Tr. pp. 52–53). Consequently, shortly after Thanksgiving in 1991, Russell, as owner and broker, took the Plaintiffs on an extensive inspection of the property. (Tr. pp. 56–60). Russell described the tour thus: "I showed them everything that I had done to the house, and all the things that needed repair, that type of thing." (Tr. pp. 146).

Upon completion of the detailed inspection, the parties entered into serious negotiations, and the requested sale price was finally reduced from $745,000 (if Debtors did all necessary repairs and painting) to $715,000 (if Plaintiffs took in "as-is" condition). (Tr. pp. 60–61; Exhibit 31, ¶ B). The parties meant the "as-is" clause to refer to all the problems Russell revealed in the home, (Tr. pp. 62–63, 85–86, 197; Exhibit 31, ¶ B), specifically, among other things, problems with the maid's quarters. (Exhibit 31, ¶ B). In addition to other documents drafted to consummate the sale, Russell prepared a "Real Estate Transfer Disclosure Statement" to satisfy California law regarding sale of a residential property, which Debtors signed December 4, 1991. (Exhibit 31). Plaintiffs in turn signed the document December 7, 1991. Escrow closed on the sale on December 19, 1991. (Exhibits 25 and 26). As consideration for the sale, Plaintiffs provided a down payment of $89,745.00, assumed a first deed of trust in favor of Peninsula Bank for $623,-560.52 and made other cash payments of $2,583.46 for a grand total of $715,888.98. (Exhibit 25). Then, on December 31, 1991, Debtors filed the instant bankruptcy petition.

From the testimony, the Court finds that the final showing by Russell entailed much more than a simple walk-through. As Shannon testified, and Russell does not dispute, the highly detailed home inspection lasted three hours, (Tr. pp. 56–60, 80–82), during which, Plaintiffs insisted on—and Russell seemed to acquiesce in—scrutinizing and obtaining explanations for the many future repairs the house and curtilage might require. When the inspection turned to the downstairs family room, Russell spent time explaining the number of renovations done, emphasizing the quality with which Debtors had completed these renovations. (Tr. pp. 56–60, 80–82). Russell also made efforts to impress the Plaintiffs by detailing the prestigious name brands used for replacement of doors, windows and carpeting. Thus the home inspection served as an opportunity for Russell to proudly display the many recent renovations and other attractive attributes. The Plaintiffs likewise used the opportunity to satisfy themselves as to the soundness of the home. Regardless, Russell's explanations in and about the family room did not, however, as Russell admitted, include mention of the drain problems under the floor or the large excavation and patch in the concrete slab upon which they stood. (Tr. pp. 56–60, 69, 147; Exhibit 60, photograph of concrete patch date August 28, 1995).

On cross-examination by Russell's counsel, Shannon also related that Russell volunteered information about some small cracks and flaking in the dry-wall of the maid's quarters—the same quarters where the shower drain repair had alerted Russell to the problems under the floor in the family room. (Tr. p. 81; see also Exhibit 31, ¶ A). In explaining away the cracks, Shannon said Russell stated he "assumed" the problems with the wall likely stemmed from the shower. (Tr. p. 81). Nevertheless, Russell, went no further to explain in full detail the true extent of the problems the shower drain had caused—specifically the extensive excavation and repairs below the family room. (Exhibit 276, Dep. of Roy Toma, pp. 45–46).

Instead, rather than reveal to Plaintiffs all he knew about the shower drain, Russell deliberately misled them, volunteering what the Court finds to be a less than half-true comment about some indefinite problems with the shower. Russell calculated this comment to reassure the Plaintiffs of his honesty by appearing to frankly relate the down-sides of the premises, and at the same time disguise the true nature of the problems Debtors had experienced with the building's structure. Full-disclosure would have required Russell to discuss with Plaintiffs the year-old shower drain repair, reveal its location, and describe how, in order to accomplish the repair, workman had to tear-back the carpet and power saw and/or jack-ham-

mer a large hole through the concrete slab supporting the cliff-perched house. The Court finds, however, that, upon queries by Plaintiffs that would have kindled specific memories of those repairs, Russell chose to deliberately omit any hint of the problems with the foundation supporting the home. Consequently, the Court finds Russell deliberately failed to provide full-disclosure.

In making this finding, the Court acknowledges that Shannon testified that neither of the Plaintiffs actually read the Real Estate Transfer Disclosure Statement (Exhibit 31) before signing it. (Tr. pp. 88–89; 91–93). Thus, when making their decision to buy the Amiford Property, Plaintiffs, could not have actually relied on the representations contained therein. The document, however, compellingly reveals Russell's intent to deceive Plaintiffs. For instance, Item 6 of the disclosure form (Exhibit 31) demands answer to the question: "Landfill (compacted or otherwise) on the property or any portion thereof." Nevertheless, despite having discussed the presence of cut and fill soil with the preparers of the pool soils report, (Exhibit 3, p. 2), Russell wrote in response to Item 6: "Unknown." Russell gave the same response, "Unknown," to Item 18, "Any defects or problems relating to the foundation," notwithstanding Russell's testimony that, prior to writing the Disclosure Statement, he pulled construction permits issued in the past to former owners, (Tr. pp. 135–135), which included a permit issued in 1962 to allow the former owners to "Reinforce Existing Foundation with (4) Concrete Piers" [sic] on the premises. Furthermore, Russell wrote the Disclosure Statement less than 24 months after hiring workmen to excavate a large hole in the house's foundation. Thus the Court finds the second "Unknown" response flatly misleading. While Plaintiffs never actually read these written untruths, these falsehoods do reveal the cunning pattern of Russell's scheme to deceive. This same scheme inspired Russell's oral obfuscation and omissions to Plaintiffs regarding the maid's shower drain and the foundation under the family room during the home inspection—representations upon which Plaintiffs did actually rely. Therefore, the Court finds

as a result of the latter oral misrepresentations, Plaintiffs were actually deceived.

In light of the foregoing contradictions, I specifically find Russell's testimony without credibility on the central factual issues of whether and to what extent Russell actually attempted to fully disclose known problems and potential problems with the house, including the presence of fill soils under the western portion of the property, and problems associated with the plumbing and house foundation. In addition, Russell's spouse, Dorothy Russell, testified to observing a bump or lump beneath the carpet in the family room, which she said she thought to have been caused by a faulty carpet lay. (Tr. p. 186). Yet, in Dorothy Russell's deposition taken August 27, 1996, she indicated that the problem arose from a crack in the concrete slab beneath the family room. (Tr. p. 186–189). Dorothy Russell tried to explain this inconsistency by avowing that Debtors had experienced problems with the bumps in the carpet in a different area of the family room from the area where the problems with the plumbing had occurred. (Tr. p. 226). Nevertheless, she still insisted she could only remember one instance where the carpet was pulled back. (Id.) Thus the Court finds Dorothy Russell's testimony unreliable on these points. In addition, the fact Defendants cannot recall who made these recent plumbing repairs, and can find no records relating to the work, further undermines their credibility, especially given that detailed memories and records in areas of the record that support their position are so readily at hand.

Plaintiffs occupied the home at 710 Amiford Way immediately upon closing of the sale in December of 1991. Over the next three years, they made extensive renovations to the home and curtilage. One of these improvements included the construction of a deck off the rear of the home, designed by architect Austin Lucius. (Tr. pp. 175–176). In connection with this construction, Russell provided Shannon a copy of the pool soils report (Exhibit 3) which Lucius discussed with Russell and one of the pool contractor's employees on a planning visit shortly after the parties had negotiated the sale price.

(Tr. pp. 64–65, 176–177). Shannon claims to have never understood the content of this conversation at the time (although Lucius did apprise him of it about a month later, in early January of 1992 (Tr. V.II. pp. 44–45)), or read the report before he forwarded it to Lucius unopened after it arrived at Plaintiffs home about a month after they occupied the house. (Tr. p. 66, V.II. pp. 45–47). Thus, while both Shannon and Lucius knew of the soils report, only Austin Lucius, who was not privy to the representations made by Russell in connection with the sale of the home and the three hour walk-through, knew of its content—including the portions revealing the presence of fill supporting the house—until mid-December, 1994. In addition, the report makes no mention of any plumbing or other problems that might give water access to the fill.

In December of 1994, Plaintiffs noticed water on the family room floor that had the smell of raw sewage. (Tr. p. 72). Beneath the slab directly under the family room, their plumber, Roy Toma, discovered a "clean break" in a drain line, where the "pipe had snapped at one point," caused in Toma's opinion by "some kind of shift in the soil." (Exhibit 276, Dep. of Roy Toma, pp. 29–30). Further investigation by Plaintiffs' home owners' insurance company led to the discovery of damaged soils beneath the house. (Tr. pp. 74–76). In hopes of curing the problem, Shannon contacted a contractor, who estimated restoring the foundation would cost $100,000. (Tr. p. 77). Rather than undergo the costly repair, Plaintiffs decided to move out of the house in June of 1995.

Plaintiffs offered expert testimony on the value of the home had Russell chosen to reveal the presence of fill and other structural problems and possible problems with the home. Robert M. Backer, MAI, a qualified real estate appraiser in practice in the San Diego Area since 1986, testified that had proper disclosures been made at the time the parties closed the sale in late 1991, the fair market value would have been some $575,000, rather than the $715,000.00 purchase price. (Tr. V.II. pp. 60–62).

In rebuttal, Defendants' offered testimony of an expert appraiser as well. Truman Brooks, a real estate professional with thirty-five years experience, who has been appraising properties in the San Diego area since the early 1980s, testified that a home similar to the 710 Amiford Drive property valued at $715,000 in late 1991 would have declined in value over the period the Plaintiffs occupied the house due to a twenty percent decline in that particular real estate market over the period. (Tr. p. 205). The general market decline would cause the house's value to fall to a low of $411,800 in 1994, which would have then recovered to a $522,900 value in 1995. (Tr. p. 206). Brooks made the key assumption, however, that the fair market value of the home at the beginning of the period was $715,000, "since the property was sold." (Tr. pp. 205–206). Brooks also assumed Russell had made complete disclosure regarding the property prior to sale. (Tr. p. 203). Brooks later admitted, however, that if the seller had known of the fill beneath the house, and had not noted that in the Disclosure Statement, then "that is not full disclosure." (Tr. p. 218).

Thus, given the Court's previous finding that Russell knew of the fill beneath the home and failed to disclose it, the absence of the key foundational assumption made by Brooks in preparing his testimony—the presence of full disclosure and consequently the fair market value—negates the relevance of Brooks' testimony to the issues of this case. Thus the record contains no relevant evidence in conflict with the testimony of Plaintiffs' expert setting valuation of the property in late 1991, had Russell made proper disclosures at the time of sale, at $575,000.

### CONCLUSIONS OF LAW

The Court has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1334 and 157(b)(1). This is a core proceeding for purposes of § 157(b)(2)(I). On the issue of the determination of non-dischargeability of debts, the Ninth Circuit imposes a "weighty burden" on creditors, strictly construing exceptions to discharge in order to further Congress's policy of affording debtors a fresh start. *In re Rahm*, 641 F.2d 755, 756–57 (9th Cir.1981); *In re Houtman*, 568 F.2d 651, 656 (9th Cir.1978); *Quarre v. Saylor (In re*

*Saylor*), 178 B.R. 209, 214 (9th Cir. BAP1995); *McCrary v. Barrack (In re Barrack)*, 201 B.R. 985, 989 (Bankr.S.D.Cal. 1996). The Court will apply the law governing this case with the foregoing policy firmly in mind.

### A. 11 U.S.C. § 523(a)(2)(A)

In a non-dischargeability action under the actual fraud provisions of 11 U.S.C. § 523(a)(2)(A)[1], the plaintiff must establish the following elements by a preponderance of the evidence:

(1) The debtor made the representations;

(2) That at the time he knew they were false;

(3) The debtor made the representation with the intention and purpose of deceiving the creditor;

(4) That the creditor relied on such representations;

(5) That the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

*Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Apte v. Japra (In re Apte)*, 96 F.3d 1319, 1322 (9th Cir. 1996); *Eugene Parks Law Corporation Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.2d 1454, 1457 (9th Cir.1992). Such a determination is a question of federal, not state law, and courts must interpret these elements consistent with the common law definition of the term actual fraud, as set forth in Restatement (Second) of Torts (1976) §§ 525–557A. *Kirsh*, 973 F.2d at 1457; *Field v. Mans*, — U.S. —, —–—, 116 S.Ct. 437, 443–444, 133 L.Ed.2d 351 (1995).

Courts typically categorize representations as either express representations or implied representations. *Interfinancial Corp. v. White (In re White)*, 130 B.R. 979, 985 (Bankr.Mont.1991); *In re Union Bank of the Middle East, Ltd.*, 127 B.R. 514, 518 (E.D.N.Y.1991). "A false representation is an express misrepresentation, while a false pretense refers to an implied misrepresentation of 'conduct intended to create and foster a false impression.'" *Matter of Newmark*, 20 B.R. 842, 854 (Bankr.E.D.N.Y.1982) (quoting *In re Schnore*, 13 B.R. 249, 251 (Bankr. W.D.Wis.1981)). The "conceptual difficulty attending such a fine differentiation," however, leads courts to typically ignore the negligible difference between the two phrases. *Id.* Moreover, of particular note for the instant case, the Court in *White* further held that "silence by the Debtor" or "concealment or intentional non-disclosure" of "a material fact can constitute a false representation actionable under § 523(a)(2)(A)." *Id.* (citing *In re Schmidt*, 70 B.R. 634, 640 (Bankr.N.D.Ind. 1986)); *Cooke v. Howarter (In re Howarter)*, 114 B.R. 682, 684 n. 2 (9th Cir. BAP1990).

A recent case from the Ninth Circuit Court of Appeals underscores the foregoing. In *Apte, supra,* the Court held "the nondisclosure of a material fact in the face of a duty to disclose" establishes the requisite reliance for actual fraud under the Bankruptcy Code. *Apte,* 96 F.3d at 1323. Distilling the standards from § 551 of the Restatement (Second) of Torts (1976), the Court elaborated on its holding by explaining that a party to a transaction has a duty to disclose a hidden material fact when the other party has no suspicion of its existence and no opportunity to discover it. *Id.* at 1324. A material fact is one which a reasonable buyer might have considered "important in the making of th[e] decision" to purchase. *Id.* at 1323; *see also, Candland v. Ins. Co. of North America (In re Candland)*, 90 F.3d 1466, 1470 (9th Cir. 1996) (for purposes of § 523(a)(2)(B), material fact is one that if revealed "would generally affect a lender's or guarantor's decision").

---

**1.** § 523(a)(2)(A) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

As to elements (2) and (3) regarding present state of mind, although a plan to deceive is never "presumed," a party's conduct may allow a court to infer the elements of knowledge, falseness and intent to deceive. *White,* 130 B.R. at 985.

Upon a showing of intentionally made omissions or false representations, a plaintiff must also establish the plaintiff's reliance on the representations in question. *Field,* —— U.S. at ——, 116 S.Ct. at 438 (1995). Such reliance need not be reasonable, but it must be justifiable. *Id.* As the Supreme Court has held in *Field v. Mans,* "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id.* at ——, 116 S.Ct. at 444 (quoting § 540 Restatement (Second) of Torts (1976)). This standard depends upon the knowledge and experience of the person to whom the representations are made. As the *Field* opinion further explained:

[A] person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses."

*Id.* (quoting § 541, Comment a., Restatement (Second) of Torts (1976)). Interpreting this standard, the Ninth Circuit Court of Appeals teaches: "Although one cannot close his eyes and blindly rely, mere negligence in failing to discover an intentional misrepresentation is no defense for fraud." *Apte,* 96 F.3d at 1322.

Finally, to prevail under 11 U.S.C. § 523(a)(2)(A), a plaintiff must establish that a claim sought to be discharged arose from an injury proximately resulting from the plaintiff's reliance on an intentionally made false representation. *Britton v. Price (In re Britton),* 950 F.2d 602, 604 (9th Cir.1991). "Proximate cause is sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible." *Id.* at 604. Further, as the Supreme Court explained in *Field,* a court may turn to the Restatement (Second) of Torts (1976), "the most widely accepted distillation of the common law of torts," for guidance on this issue. *Field,* —— U.S. at ——, 116 S.Ct. at 443.

Turning to the Restatement, proximate cause entails (1) causation in fact, which requires a defendant's misrepresentations to be a "substantial factor in determining the course of conduct that results in [the plaintiff's] loss," § 546; and (2) legal causation, which requires the plaintiff's loss to have been "reasonably expected to result from the reliance," § 548A. In determining the presence of proximate cause, however, courts must refrain from relying on speculation to determine whether and to what extent a creditor would have suffered a loss absent fraud. *Siriani v. Northwestern National Ins. Co. of Milwaukee, Wisc. (In re Sirani),* 967 F.2d 302, 306 (9th Cir.1992).

The Court finds Plaintiffs have shown by a preponderance of the evidence that their claim satisfies the foregoing criteria for non-dischargeability under 11 U.S.C. § 523(a)(2)(A). First, Russell made both material misrepresentations and material omissions to Plaintiffs in connection with the sale of the home at 710 Amiford Drive. As has been shown, Russell distorted the true nature of problems with the plumbing in the maid quarters, and failed to disclose excavations in the concrete slab beneath the family room. The materiality of these misrepresentations arises from the $140,000 negative impact that truthful disclosure would have had on the fair market value of the home, and consequently, on Plaintiffs' decision to buy the property for $715,000.

Second, as has been explained in some detail, Russell knew at the time of the home inspection with the Plaintiffs of the potential structural problems with the home. Russell cannot excuse these lapses and distortions to faulty memory. The excavation in the basement, as evidenced by Exhibit 60, constituted a major repair job. Rather than relate those problems, Russell deliberately omitted their discussion in a successful effort to deceive Plaintiffs.

Third, the written misrepresentations Russell specifically knew to be untrue in the Disclosure Statement strongly indicate a present intent to deceive Plaintiffs. While Plaintiffs failed to read the written Disclosure Statement, the presence of the falsehoods therein and the implications for intent arising from such, make the unread Disclosure Statement highly relevant to this case. The Court also finds it pertinent to consider as background behind such deception, that due to their financial condition at the time, Debtors faced imminent foreclosure on the Peninsula Note and Trust Deed, which was in default by the time of the purchase. (Tr. p. 61, 140–142). In sum, Debtors were pressed to sell the house in order to relieve themselves from their financial dilemma.

Fourth, while Plaintiffs never actually relied on the unread Disclosure Statement, as has been shown, they did rely on the oral representations made to them by Russell during the three hour home inspection, and were actually deceived by these prevarications. Whether they did so justifiably depends on whether, by the use of their senses and experience, Plaintiffs had the capacity to appreciate the falsity of Russell's representations at the time they were made. *Field*, —— U.S. at ——, 116 S.Ct. at 444. Clearly, Plaintiffs could not observe or sense the problems with the foundation under their feet as they inspected the home. Nor did Plaintiffs, as "ordinary" residential home buyers, *Kirsh*, 973 F.2d 1454, have the kind of background, such as, for instance, in construction or real estate, that would have told them that houses built upon hill-sides can suffer from conditions that result in massive foundation problems absent catastrophic acts of God like floods, landslides or earthquakes.

Further, Russell represented himself to be experienced in the real estate business, and Plaintiffs therefore placed value on the relative expertise with which Russell spoke. Thus the Court concludes the reliance Plaintiffs placed on Russell's representations with regard to the problems caused by the shower drain in the maid's quarters, and upon Russell's lack of disclosure as to any past problems relating to the foundation, or the presence of fill beneath the house, was justifiable under the circumstances. Moreover, Russell's silence, concealment and intentional non-disclosure of the slab problems constitute false representations and the requisite reliance actionable under § 523(a)(2)(A). *Apte*, 96 F.3d at 1323–1324 (an obligation to disclose combined with a withholding of a material fact "establish the requisite element of causation in fact"); *Cooke*, 114 B.R. at 684 n. 2; *Newmark*, 20 B.R. at 854. It may be argued that reasonable buyers would have taken the precaution to engage a building inspector, who may have apprised them of the problems with the home before they closed the sale. Given Russell representations, and the detailed inspection he gave Plaintiffs, however, the Court concludes that such a failure would be at worst negligence on Plaintiffs part, and as the holding of *Apte*, 96 F.3d at 1322, teaches negligence on the part of a plaintiff "is no defense for fraud."

Russell's misrepresentations caused Plaintiffs damages. Plaintiffs' expert testified that full disclosure of the problems and potential problems with the home would have given it a fair market value of $575,000. The Court has found the record barren of evidence in dispute of this figure. Absent full disclosure, Plaintiffs paid $715,000. Consequently, based on Russell's untruthfulness, Plaintiffs paid Debtors much more than the true value of the home, and thus sustained a loss of $140,000.

Defendants attempted to attack the proximate cause element of Plaintiffs' action with the expert testimony of Leslie Dean Reed, a geologist who reviewed, among other things, the various soils reports conducted on the property to prepare his testimony. In Reed's opinion, the fill soil beneath the home was properly compacted to a rate of over

ninety percent, which construction engineers use as their target compaction rate, and which the city of San Diego will accept as adequate. (Tr. pp. 93, 104). Reed also said fill soils commonly occur under homes in the San Diego area, and that such a presence, when adequately compacted, does not normally constitute a building defect. (Tr. p. 103). Finally, Reed said that based on his review of the records, he thought that no settlement was present under the house in 1991. (Tr. p. 102). With regard to the damage to the home in 1995, Reed opined that the presence of water affected the fill and caused the foundation problems that eventually manifested themselves. Reed further testified that no matter how well compacted the soil, excess water can cause such problems. (Tr. p. 100).

The intended implication of all this testimony is that, assuming Russell had disclosed the presence of fill, and assuming Plaintiffs had hired soil reports done, they would have discovered adequate compaction in the fill on the property, which would have had no effect whatsoever on either Plaintiffs decision to buy or on the sale price, except perhaps by decreasing its value by the cost of a soils report. Further, Reed expressly opines that the slippage which eventually undermined the foundation of the home did not occur until long after Plaintiffs took possession. Thus Defendants have sought to attack the materiality of Russell's misrepresentations, and the proximate cause of the damages. The Court finds such efforts, however, ultimately unpersuasive.

 With regard to the former issue, Russell did not conceal the presence of fill alone. Two other important characteristics of the house—the maid's shower drain problem and the 1962 foundation reinforcement—which Russell either distorted or concealed, *combined* with the presence of fill, make the misrepresentations material. Defendants' expert Reed testified that the presence of water, not of fill caused the house to shift. Reed further speculated as to where the water had come from, perhaps from heavy rains. (Tr. p. 100). But in the same breath, Reed also admitted that the water could have come from the "plumbing breaks," which the

record establishes in fact actually occurred. Thus, notwithstanding Reed's testimony, the presence of fill and its exposure to water damage as a result of a history of leaky plumbing are facts that "might" have influenced Plaintiffs' buying decision. *Apte,* 96 F.3d at 1323–1324. The Court therefore finds these facts material.

 The attack on proximate cause asks the Court to surmise that had Plaintiffs been told of the presence of fill and of the leaky plumbing, and had they then decided to have a soils report prepared, they would have found at least 90% fill compaction under the property, and would have purchased the home any way, because the alleged cause of the slippage—heavy rains—did not occur until long after they took possession. The only evidence in the record, however, to support such a finding stems from hedged conclusions and vague implications made by Reed, whose investigation consisted merely of reviewing past building inspectors' records. Such conjecture by the Court "would indulge in the type of speculation which *Siriani,* 967 F.2d at 306, specifically forbids." *Candland,* 90 F.3d at 1471. Furthermore, pursuant to § 548A of the Restatement (Second) of Torts (1976), the Court finds an experienced real estate broker such as Russell should reasonably have expected that eventual slippage could result in a hill-side home under which he knew there was both fill soil and a history of leaky plumbing, especially when combined with his knowledge of the former foundation reinforcements done by the previous owners. Indeed, Russell displayed this sort of knowledge and expectation when expressing his concern about the safety of a pool "built in the side of a cliff." (Tr. p. 122).

In light of the foregoing discussion, the Court finds Plaintiffs claim against Debtors nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Now the Court must determine the measure of damages.

 The Court notes at the outset that it has the requisite authority to award damages in this case. A "suit by a third party creditor ... against the debtor (and thus the bankruptcy estate), is a 'core proceeding' under 28 U.S.C. § 157(b)(2)(B). As such, the

bankruptcy court has jurisdiction to adjudge the validity and amount of a claim together with its dischargeability." *Longo v. McLaren (In re McLaren )*, 3 F.3d 958, 965–966 (6th Cir.1993). As the court in *McLaren* recited:

> "allowing the bankruptcy judge to settle both the dischargeability of the debt and the amount of the money judgment accords with the 'rule generally followed by courts of equity that having jurisdiction of the parties to controversies brought before them, they will decide all matters in dispute and decree complete relief.' " [*N.I.S. Corp. v. Hallahan (In re Hallahan)*, 936 F.2d 1496, 1508 (7th Cir.1991) ] (quoting *Alexander v. Hillman*, 296 U.S. 222, 242, 56 S.Ct. 204, 211, 80 L.Ed. 192 [1935] ). Because a party properly before a court of equity subjects himself "to all the consequences that attach to an appearance," *id.,* the amount of [a debtor's] liability [can be] properly determined by the Bankruptcy Court. *Id.*

*McLaren,* 3 F.3d at 965–966.

■ Section 523(a)(2)(A) of the Bankruptcy Code limits recovery to "money, property, services, or an extension, renewal, or refinancing or credit, to the extent obtained, by" a false representation or actual fraud. In the Ninth Circuit, this means a judgment entered pursuant to § 523(a)(2)(A) may not exceed the amount of benefit to the debtor that the fraudulent conduct created. *Palmer v. Levy (In re Levy )*, 951 F.2d 196, 199 (9th Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Bugna v. McArthur (In re Bugna),* 33 F.3d 1054, 1059 (9th Cir.1994). "Obtained" means "to get possession of; to procure; to acquire." BLACK'S LAW DICTIONARY 1078 (6th Ed.1990); *Medley v. Owen (In re Owen )*, 181 B.R. 288, 290 (Bankr.W.D.Va.1995). Courts have relied upon the literal reading of "obtain" under § 523(a)(2)(A) to limit the amount of nondischargeable claims to the actual benefit to the debtor, rather than the full range of compensatory damages (such as the total amount due on a breached contract entered into as a result of fraud) consequential damages (such as moving costs) or punitive damages. *Levy,* 951 F.2d at 199; *Owen,* 181 B.R.

at 290. Stated differently, courts should not give relief under § 523(a)(2)(A) for all damages "caused" by a debtor's fraudulent conduct, merely for those benefits "obtained" by a debtor through fraud. *Levy,* 951 F.2d at 198; *Owen,* 181 B.R. at 290–291. Plaintiffs may not, however, recover damages flowing from the harm done them unless the harm directly benefited the debtors.

■ In the case at bar, Debtors sold a parcel of real estate with a fair market value, given full disclosure, of $575,000 to Plaintiffs for consideration of $715,000 in cash and assumed mortgage obligations. As a result of Russell's misrepresentations, Debtors therefore acquired through the sale $140,000 more than the home was actually worth. Plaintiffs can therefore recover $140,000, or the amount obtained by Debtors through false representations. The Court cannot, however, enter judgment in favor of Plaintiffs for other damages, such as costs of repair, loss in value of the home due to structural problems, or moving costs.

■ As discussed above, this adversary proceeding arises under federal law, 11 U.S.C. § 523(a)(2)(A). Under this statute, Plaintiffs' Closing Brief seeks prejudgment interest, attorney fees and punitive damages. Punitive damages may be sought under 11 U.S.C. § 523(a)(6), *infra.* Such damages, even if awarded in a § 523(a)(2) action, however, would be subject to discharge. *Levy,* 951 F.2d at 199. The Court declines to award punitive damages only to turn around ultimately and declare them dischargeable. The law does not require the Court to indulge in an idle act.

■ Having found, however, Plaintiffs entitled to relief under § 523(a)(2)(A), the Court has the discretion to award prejudgment interest from the date Plaintiffs made their demand for damages in the adversary proceeding. In *Acequia, Inc. v. Clinton (In re Acequia, Inc.),* 34 F.3d 800, 818 (9th Cir. 1994) (relying on *Purcell v. United States,* 1 F.3d 932, 942–943 (9th Cir.1993)), the Court

held: "[T]he award of prejudgment interest in a case under federal law is a matter left to the sound discretion of the trial court. Awards of prejudgment interest are governed by considerations of fairness and are awarded when it is necessary to make the wronged party whole." Although subsection 523(a)(2)(A) does not specifically provide for an award of interest, "the failure to mention interest in [federal] statutes which create obligations has not been interpreted by the courts as manifesting a unequivocal Congressional purpose that the obligations shall not bear interest." *Rodgers v. United States,* 332 U.S. 371, 373, 68 S.Ct. 5, 6–7, 92 L.Ed. 3 (1947). Nevertheless, *Acequia,* 34 F.3d at 818–819, specifically restrains the award of prejudgment interest in this manner:

> ... In bankruptcy proceedings, the courts have traditionally awarded prejudgment interest from the time demand is made or an adversary proceeding is instituted *unless the amount of the contested payment was undetermined prior to the bankruptcy court's judgment.* ·

(quoting *Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers, Inc.),* 4 F.3d 1556, 1566 (10th Cir.1993)) (emphasis added). In the case *sub judice,* the claims of the plaintiff were undetermined and unliquidated prior to the filing of the adversary complaint. Until this Court's Order and Judgment specifically calculating the damages, the amount clearly remained in dispute and undetermined. Under this set of circumstances, the award of prejudgment interest is foreclosed. *Acequia,* 34 F.3d at 818–819; *Turner,* 4 F.3d at 1566.

In addition, under the Code, a creditor may not recover attorney fees. *Sunclipse, Inc. v. Butcher (In re Butcher ),* 200 B.R. 675 (Bankr.C.D.Cal.1996); *AT & T Universal Card Services v. Bonnifield (In re Bonnifield ),* 154 B.R. 743, 745 (Bankr.

N.D.Cal.1993); *Itule v. Metlease, Inc. (In re Itule ),* 114 B.R. 206, 213 (9th Cir. BAP 1990); *Fobian v. Western Farm Credit Bank (In re Fobian ),* 951 F.2d 1149 (9th Cir.1991). Section 523(a)(2)(A) does not provide for an award of attorney fees and the Court may not award Plaintiffs such fees for prosecuting this non-dischargeability action. Plaintiffs' reliance on the terms of the written contract which provides for attorney fees is likewise misplaced. To reiterate, under the foregoing analysis, Plaintiffs are entitled to only $140,-000.00—the amount obtained from them by Debtors by fraud.

### B. 11 U.S.C. § 523(a)(6)

In *McCrary v. Barrack,* Hon. Peter W. Bowie, Bankruptcy Judge for the Southern District of California, recently surveyed the case law interpreting 11 U.S.C. § 523(a)(6).[2] *Barrack,* 201 B.R. at 985. The facts underlying the claim involved misrepresentations by the debtors with regard to their financial condition. *Id.* at 988. Because the representations related to the debtors' financial condition, the plaintiffs could not pursue the action under 11 U.S.C. § 523(a)(2)(A), but could rely only on § 523(a)(2)(B). *Id.* The representations, however, were all oral, and therefore could not satisfy the writing requirement of the latter subsection. Consequently, the plaintiffs attempted to pursue their action under the willful and malicious provisions of § 523(a)(6). *Id.* In granting the debtors' motion to dismiss, Judge Bowie concluded that notwithstanding the decisions by other bankruptcy courts to the contrary, actions for non-dischargeability of claims based on misrepresentations made by debtors give rise to actions only under 11 U.S.C. § 523(a)(2). *Barrack,* 201 B.R. at 989. To allow such wrongdoing to give rise to actions under § 523(a)(6) would be to render the fraud sections of § 523 superfluous. *Id.* Determining the two sections mutually exclusive, the holding specifically stated:

> Furthermore, even if the injury suffered by the Plaintiff could fall within the scope

---

**2.** § 523(a)(6) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does

not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity; ...

of Section 523(a)(6), the more specific statute, Section 523(a)(2), should still control. It is a fundamental maxim of statutory construction that a specific statutory section qualifies a more general section and will govern, even though the general provisions, standing alone, would encompass the same subject. *Trustees of Amalgamated Ins. [Fund] v. Geltman Industries,* 784 F.2d 926, 930 (9th Cir.1986), *cert. denied,* 479 U.S. 822, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986); *Monte Vista Lodge v. Guardian Life Ins. Co. of America,* 384 F.2d 126, 129 (9th Cir.1967), *cert. denied,* 390 U.S. 950, 88 S.Ct. 1041, 19 L.Ed.2d 1142 (1968). *See also Markair, Inc. v. C.A.B.,* 744 F.2d 1383, 1385 (9th Cir.1984). Where both a specific and a general statute address the same subject matter the specific one takes precedence. *In re County of Orange,* 179 B.R. 185, 190 (Bankr.C.D.Cal.1995). Since Section 523(a)(2) deals specifically with debts arising from fraud and misrepresentations it should govern such debts; Section 523(a)(6) should not be used as a catch-all by claimants who cannot meet the requirements of Section 523(a)(2).

*Id.* at 990–991.

■ In the instant case, this Court has already found that 11 U.S.C. § 523(a)(2)(A) applies. Nevertheless, Plaintiffs have pled under 11 U.S.C. § 523(a)(6) in an effort to circumvent the "obtained by" limits on their damages, either compensatory or punitive. See Part B., *supra; Grogan,* 498 U.S. at 282, n. 2, 111 S.Ct. at 657 n. 2. In addition, it could be argued that Judge Bowie's decision covers only claims arising from fraudulent misrepresentations of financial condition not relevant to the facts at bar. This Court concludes, however, to the contrary. Judge Bowie's opinion expressly clarified that in cases where plaintiffs have alleged only financial loss and no other damages, such as conversion of property or personal injury, § 523(a)(6) simply does not apply.[3] *Barrack,* 201 B.R. at 993; *Levy,* 951 F.2d at 199. Finding the record barren of other than claims for financial losses, the Court cannot

invoke the willful and malicious provisions of § 523(a)(6) against the Debtors in this case.

■ Furthermore, even if the Court could apply § 523(a)(6), a plaintiff must show a defendant committed a "wrongful act ... done intentionally, [which] necessarily produces harm and is without just cause or excuse ... *even absent proof of a specific intent to injure.*" *Gee v. Hammond (In re Gee),* 173 B.R. 189, 191–192 (9th Cir. BAP 1994) (citing *In re Cecchini,* 780 F.2d 1440, 1443 (9th Cir.1986)) (emphasis in original). The BAP went on to explain that:

In order to show "malice" under § 523(a)(6), a creditor must show: ... (b) that the [debtor's] act necessarily produced harm.... The phrase "necessarily produced harm" has been interpreted to mean that the "act must be targeted at the creditor, at least in the sense that the act is certain or almost certain to cause financial harm." The Ninth Circuit further refined its definition of malice by ruling that a creditor must show that the debtor had actual knowledge or the reasonable foreseeability that his conduct might result in injury to the creditor.

*Id.* at 192 (citations omitted).

■ Applying these standards to Russell's actions in the case at bar, the Court finds that Plaintiffs have failed to show that Russell had actual knowledge of any damages that may have occurred to the house prior to the date of sale, or that Russell had a reasonable foreseeability that damages would necessarily occur due to his misrepresentations. Russell certainly knew these kinds of problems *could* result, but Plaintiffs have not shown by a preponderance that he knew, with a reasonable degree of certainty, that damages had already resulted, or that they *necessarily would.* Consequently, in view of the Code's underlying fresh start policy, which gives the benefit of the doubt to the debtor in matters of dischargeability, the Court finds the wrongdoing visited upon Plaintiffs by Russell does not rise to the degree of culpability necessary to find "malice" pursuant to 11 U.S.C. § 523(a)(6).

---

3. Judge Bowie also consigned footnote 2 of *Grogan* to mere *obiter dicta* not binding on the

Court. *Barrack,* 201 B.R. at 992.

### C. Statute of Limitations

Finally, Defendants claim the affirmative defense that the Statute of Limitations has run on Plaintiffs' fraud and nondisclosure claims arising under California law. As has been discussed, claims under 11 U.S.C. § 523(a)(2)(A) arise under purely federal common law. *Kirsh*, 973 F.2d at 1457. Nevertheless, state statutes of repose determine the enforceability and therefore the allowability of such claims in bankruptcy. 11 U.S.C. § 502(b)(1); Lawrence King, 3 *Collier on Bankruptcy* ¶ 502.02 (15th ed.). So too does state law govern the time-bar dismissal of complaints for dischargeability of debt. *Lee–Benner, by and through Mills v. Gergely* (*In re Gergely*), 186 B.R. 951, 961 (9th Cir. BAP 1995); *Klein v. Deicas* (*In re Deicas*), 137 B.R. 51 (Bankr.S.D.Cal.1992).

In *Gergely*, the plaintiff sued in state court on theories of medical negligence. The state court ultimately found in plaintiff's favor for some $700,000. *Id.* at 954. The defendant's insurance carrier, however, turned out to be insolvent, and the claim went unpaid. *Id.* Three years after the adverse judgment, the defendant filed Chapter 7, listing the plaintiff as an unsecured creditor. *Id.* In an effort to defeat the discharge, and ten years after the factual events giving rise to the claim, plaintiff brought a non-dischargeability action under §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6)—allegations that plaintiff had never pleaded in the state court case. The BAP surveyed, analyzed and distinguished the leading case law on this issue. Citing *Penn. Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 559, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990), the Panel ruled that at the defendant's petition date the claims were not enforceable under state law due to the state statute of limitations and therefore were not allowable claims against the estate under § 502(b)(1). *Gergely*, 186 B.R. at 955. Consequently, since only obligations enforceable at the time of filing can be declared nondischargeable, the BAP affirmed the bankruptcy court's dismissal of the case on the grounds that the state statute of limitations had expired.

In *Deicas*, 137 B.R. at 51, from 1979 to 1983 the defendants sold plaintiffs certain stocks in various domestic and foreign corporations, purportedly formed to purchase and develop real estate. The plaintiffs, however, never received stock certificates. *Id.* at 52. The plaintiffs also purchased, by separate transaction, real estate from the defendants, but no deed was ever issued. In 1984, the defendants repurchased their interests in the described assets from the plaintiffs in exchange for two promissory notes from a third party corporation owned by the defendants, one of which was secured by deed of trust, and three promissory notes from the defendants, two of which were secured. *Id.* at 53. When the defendants could not make payments, the parties entered into a "settlement agreement" in 1986 to restructure the debt, and mutually absolve one another from liability on the past transactions. After the defendants failed to meet their obligations under the latter agreement, according to its terms, in August 1986, the past obligations became due and owing. In March of 1988, the defendants filed bankruptcy under Chapter 11. In a June 1988 § 2004 examination, plaintiffs claimed to discover they had been defrauded. The case was converted to Chapter 7 in March 1989, and in June 1989, the plaintiffs filed an adversary proceeding objecting to the discharge of claims arising from fraud. The Chapter 7 was dismissed, but then defendants in January 1991, filed another Chapter 7, which led to a second adversary complaint filed by the plaintiffs under 11 U.S.C. § 523(a)(2)(A). *Id.* at 53.

In dismissing the complaint as tardily filed, Hon. John J. Hargrove, Bankruptcy Judge for the Southern District of California, held that since federal law contains no statute of limitations for § 523(a)(2)(A), pertinent state law, in that case the California Code of Civil Procedure, § 338(d) (West 1982), applies. *Id.* at 54. Judge Hargrove explained: "To determine whether the statute of limitations bars the plaintiffs' fraud claim, the sole issue is whether the plaintiffs could have discovered the fraud through the exercise of reasonable diligence." *Id.* (citing *Sun 'n Sand, Inc. v. United California Bank*, 21 Cal.3d 671, 148 Cal.Rptr. 329, 582 P.2d 920 (1978)). In addition, discovery of fraud does not mean discovery of the evidence to prove it, but

discovery of enough evidence to merely suspect it. *Id.* at 54–55. "Where the circumstances compel the conclusion that a prudent person would have suspected the fraud, the court may determine as a matter of law, that there has been discovery." *Id.* at 55 (citing *National Automobile & Cas. Ins. Co. v. Payne,* 261 Cal.App.2d 403, 409, 67 Cal.Rptr. 784 (1968)). Since the plaintiffs—and their competent legal advisers—were determined to have had enough information in 1986, at the time of the "settlement agreement," to have aroused suspicions of fraud in a reasonable mind, the statute of limitations was held to have begun to run at that time. *Id.* at 54–55.

Judge Hargrove further ruled that filing of a bankruptcy petition does not toll the statutory period, expanding thus:

> Section 108(c) was intended to remedy the situation where a debtor filed bankruptcy to allow the statute of limitations to run, and then used the statute of limitations as a complete defense. *In re Morton,* 866 F.2d 561, 566 (2d Cir.1989). There is no language in section 108(c) that suspends a statute of limitations from running. *Grotting v. Hudson Shipbuilders, Inc.,* 85 B.R. 568, 569 (W.D.Wash.1988). Rather, in partial exchange for the stay, section 108(c)(2) grants a claimant an exclusive 30 day period in which to file its claim when the claims' limitation period expired before the automatic stay was lifted. "The language in section 108(c)(1) referring to 'any suspension of such period' means those non-bankruptcy law tolling periods such as minority or incompetency of a plaintiff." *Id.* at 569.

*Id.* at 55. Moreover,

> [I]t is clear that § 108(c) does not apply to proceedings in the bankruptcy court. Non-dischargeability proceedings accelerate the discovery process because the dischargeability of a debt can significantly affect a debtor's ability to obtain a fresh start.

*Id.* (footnote omitted). Thus, the defendants' filing of bankruptcy had no effect on the time-bar clock. *Id.* Consequently, since the statute of limitations began to run prior to three years before the filing of the defen-

dants Chapter 7 bankruptcy, on January 18, 1991, the statute had expired on the plaintiffs non-dischargeability claims. *Id.* at 54.

■ Neither of the foregoing cases is perfectly analogous to the facts at bar. Both cases, however, illustrate the controlling principle that, for the purposes of complaints alleging the non-dischargeability of debts in bankruptcy, state statutes of limitations apply, and the filing of a bankruptcy petition should have no effect on when such statutes expire.

■ The applicable statute of limitations for fraud in the instant case is identical to the one in *Deicas, supra*—Cal.Civ.Pro. Code § 338(d) (West 1996 Supp.), which provides:

> Within three year: ... (d) An action for relief on the ground of fraud or mistake. The cause of action in that case is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake.

As the opinion in *Deicas* teaches, 137 B.R. at 55, if a reasonable person would have suspected the facts constituting fraud, a cause of action for such is deemed to have accrued. Thus, Debtors in the instant case argue that as soon as Shannon learned of the presence of the soils report from architect Lucius, or as soon as Lucius learned of the presence of fill from reviewing the report, at latest by January of 1992, the statute of limitations began to run. The Court disagrees.

First, while Shannon learned of the soils report from Lucius, he never learned of its content. Moreover, while Lucius learned of the presence of fill from review of the report, Lucius never knew of Russell's omissions with regard to fill during the home inspection. Thus, unless, after Lucius reviewed the report, it would have been reasonable for Shannon to question him about it, the Court cannot say Shannon or Lucius could or should have had the requisite information available to suspect fraud. Since Shannon testified that Lucius' would "take care of everything for me," there was no reason for Shannon—the layman—to interrogate Lucius—the expert—about the details of the deck plans. Further there was certainly no rea-

son for the two to discuss the conversations Russell had with Shannon regarding the plumbing under the house. Even if they had, since Russell never mentioned the hole in the slab put there to repair a water leak, Lucius could never have learned of it from Shannon. Thus the Court concludes that, given the foregoing circumstances, it would not have been reasonable for Shannon or Lucius to have discovered sufficient facts to give rise to a suspicion of fraud in December of 1991 or January of 1992. This conclusion follows even if, as Debtors argue, Shannon must be charged with the knowledge of Lucius, as Shannon's architectural agent.

In *Deicas*, 137 B.R. at 53–54, somewhat analogous, yet fundamentally different facts obtained. The plaintiffs had engaged expert advisors, in the persons of what the court found to be competent legal counsel, to represent them. Consequently, the court charged the plaintiffs with the expertise, and the reasonable suspicions that should have arisen therefrom, of their lawyers in negotiating a "settlement agreement" with the defendants. Notwithstanding this similarity, unlike the experts in *Deicas* (who had access to all the information and responsibility for offering counsel on all aspects of the negotiations that the court determined should have aroused in plaintiffs suspicions of fraud), the expert adviser in this case had, at best, limited knowledge of the facts surrounding the change in possession or the representations constituting the deception. Further, the Plaintiffs in this case did not seek or rely on the expert's advice in making the decision to enter the transaction. Thus, the ultimate decision in *Deicas* is factually distinguishable from the case at bar.

Furthermore, the facts that constitute the fraud alleged in this case go beyond Russell's mere concealment from Plaintiffs of the presence of fill. The crux of the case involves three facts concealed by Russell—the fill, the water access to it via the plumbing problems and the subsequent foundation excavations. The Court found that Russell concealed the excavation in the basement, knowledge of which would have had an impact on Plaintiffs' buying decision. This fact was never revealed, and Plaintiffs' cause of action never

accrued, until January 3, 1995, when plumber Toma jack-hammered a hole in the family room floor and discovered the broken plumbing and the evidence of Debtors' prior repair. Under California law, the Court holds that Plaintiffs had three years from this discovery to file an action for fraud, or until January 3, 1998. Since Plaintiffs did so on May 29, 1996, Debtors can find no refuge from the statute of limitations.

### Conclusion

The Court finds from the evidence that Russell made material misrepresentations and omissions to Plaintiffs, with both knowledge of their falsity and an intent to deceive. Moreover, due to such deception, Plaintiffs suffered loss. Therefore, pursuant to 11 U.S.C. § 523(a)(2)(A), Plaintiffs claims are non-dischargeable, at least to the extent that Debtors obtained monies by fraud. The Court further determines that Debtors obtained by fraud $140,000.00 in value greater than the consideration they gave in return. Finally, Debtors can claim no defense from the statute of limitations because such would not have expired until approximately 18 months after Plaintiffs filed the instant complaint. On the other hand, since 11 U.S.C. § 523(a)(2)(A) applies, Plaintiffs may not recover under § 523(a)(6) for damages due to false representations. Furthermore, even if § 523(a)(6) did apply, Plaintiffs have failed to show that Debtors injured them with sufficient malice to satisfy the requirements of the subsection. Moreover, Plaintiffs are not entitled to prejudgment interest, attorney fees or punitive damages on any of their claims. Accordingly,

IT IS ORDERED The Clerk of the Court shall:

1. Enter a judgment in favor of Debtors/Defendants Keith D. Russell and Dorothy Russell on the Complaint filed by Plaintiffs Carlos R. Shannon and Linda P. Shannon on May 29, 1996, dismissing the allegations lodged under 11 U.S.C. § 523(a)(6);

2. Enter a judgment in favor of Plaintiffs Carlos R. Shannon and Linda P. Shannon and against Debtors/Defendants Keith D. Russell and Dorothy Russell on the Com-

plaint filed by Plaintiffs on May 29, 1996, declaring nondischargeable, pursuant to 11 U.S.C. § 523(a)(2)(A), a claim in the amount of $140,000.00 owed to Plaintiffs by Debtors/Defendants arising from the Debtors' commission of false representations and actual fraud.