**In re COUNTY OF ORANGE, a political subdivision of the State of California; Orange County Investment Pools, an instrumentality of the County of Orange, Debtors.**

**ALLIANCE CAPITAL MANAGEMENT L.P. and Putnam Investment Management, Movants,**

v.

**COUNTY OF ORANGE, Orange County Investment Pools, Respondents.**

**Bankruptcy Nos. SA 94–22272 JR, SA 94–22273 JR.**

United States Bankruptcy Court, C.D. California.

March 8, 1995.

---

Bruce Bennett, Stutman, Treister & Glatt, Los Angeles, CA, Sp. Reorganization Counsel, for debtors.

Robert Darby, Fulbright & Jaworski, and Clarisse W.J. Young, Paul Hastings Janofsky Walker, Los Angeles, CA, for movants.

## MEMORANDUM OPINION

JOHN E. RYAN, Bankruptcy Judge.

On June 7, 1994, the County of Orange (the "County") issued bonds aggregating $169,000,000 pursuant to the "temporary borrowing" provisions of California Government Code §§ 53850–53858. Pursuant to § 53856, the County pledged certain future tax and other general revenues to pay the principal and interest on the notes.

Alliance Capital Management L.P. and Putnam Investment Management (the "Movants"), representing holders of notes totalling about $50 million, brought this motion for relief from stay (the "Motion") to have the stay terminated to allow the Movants to file a writ of mandate complaint in state court to force the County to set aside certain revenues for payment on the notes. The County objects, arguing that the noteholders have no interest in the County's revenues because § 552(a) of the Bankruptcy Code cuts off their lien rights as of the filing of the bankruptcy petition.

At a hearing on February 23, 1995, I took the matter under submission to determine whether the noteholders retain a post-petition lien on the County's revenues.

## JURISDICTION

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a) (the district courts shall have original and exclusive jurisdiction of all cases under Title 11), 28 U.S.C. § 157(a) (authorizing the district courts to refer all Title 11 cases and proceedings to the bankruptcy judges for the district) and General Order No. 266, dated October 9, 1984 (referring all Title 11 cases and proceedings to the bankruptcy judges for the Central District of California). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

## STATEMENT OF FACTS

On June 7, 1994, the County's Board of Supervisors (the "Board") adopted Resolution No. 94-675 (the "Resolution"), whereby the Board authorized the County to borrow up to $200,000,000 pursuant to the temporary borrowing provisions of California Government Code (the "Government Code") §§ 53850-53858.[1]

Under the Resolution, the Board authorized the County to issue notes, designated as "County of Orange, 1994-95 Tax Anticipation Notes Series ___" (the "TRANS"). In the Resolution, the Board also pledged cer-

tain tax and other unrestricted revenues as security for the TRANS.[2]

The Board also declared in the Resolution that all pledged monies, when received, must be set aside in a special fund (the "Set-Aside"). Moreover, if during any month the Set-Aside is insufficient to satisfy the TRANS requirements, the County is required to make up the difference from any generally available funds the County receives during fiscal year 1994-95.

On June 27, 1994, the County and the underwriter, PaineWebber, Inc. ("Paine-Webber"), executed a Contract of Purchase (the "Contract") providing for the sale of the TRANS to PaineWebber in accordance with the terms set forth in the Resolution. On July 5, 1994, the transaction closed, and the County delivered the TRANS to Paine-Webber.

In September, October and November of 1994, the County made each Set-Aside required under the Contract. The County invested the Set-Asides in the Orange County Investment Pools (the "Pool") as permitted under Government Code § 27000 et seq.[3]

On December 6, 1994, prior to making its December Set-Aside, the County and the Pool shocked the nation by filing Chapter 9 petitions in bankruptcy. The filings were caused by substantial losses in the Pool.[4]

On December 29, 1994, the County filed an ex parte motion for an order authorizing

---

1. Under Government Code § 53852, a local agency may borrow money by issuing notes. These notes must be issued pursuant to a resolution that sets forth the form and manner of execution of the notes. Cal.Gov't Code § 53853 (West 1983).

2. Specifically, the TRANS were secured against the first tax and other unrestricted revenues received by the County on the following dates and in the following amounts:

| Amount | Date |
| --- | --- |
| $14,500,000.00 | 9/16/94–9/30/94 |
| $ 8,100,000.00 | 10/94 |
| $14,500,000.00 | 11/94 |
| $34,700,000.00 | 12/94 |
| $18,700,000.00 | 01/95 |
| $ 8,900,000.00 | 02/95 |
| $12,600,000.00 | 03/95 |
| $20,300,000.00 | 04/95 |

| | |
| --- | --- |
| $33,800,000.00 | 05/95 |
| $34,400,000.00 | 06/95 |

3. Section 27000 provides: "The county treasurer shall receive and keep safely all money belonging to the county...."

4. Monies from various entities were invested in the Pool. The Pool has 187 investors including many school, water, sanitation and transportation districts, pension funds, etc. The total amount invested in the Pool was approximately $7.5 billion. The Pool losses are currently estimated at approximately $1.7 billion. The County leveraged the Pool portfolio to increase the income return for the Pool participants. As interest rates increased, the value of the collateral pledged to secure the Pool loans decreased. In early December, some of the lenders to the Pool made demand for additional collateral. Faced with the prospect of the liquidation of the Pool portfolio, Debtors filed their Chapter 9 petitions.

certain payments on bond obligations. In the motion, the County stated that it would not make its remaining Set–Aside payments. The County argued that its action was necessary and proper because under § 552(a) of the Bankruptcy Code (the "Code")[5], the lien created by the Contract did not attach to post-petition revenues.

On January 4, 1995, I conducted a hearing on the County's *ex parte* motion. At the hearing, the County presented the testimony of Paul Sachs, a partner with Arthur Andersen & Company. Sachs presented projections of the County's General Fund cash flow for the remainder of the fiscal year ending June 30, 1995. These projections demonstrated that, based on pre-petition expenses, the County would have insufficient cash flow from its General Fund to meet both its operating expenses and its debt service (including the Set–Asides).

On January 10, 1995, the Movants filed the Motion to have the stay terminated to enable them to seek a writ of mandate in state court compelling the County to make the Set–Asides. The Movants contended that relief was necessary because (1) Movants' only recourse is to state court, (2) granting relief from stay will further Congressional policy of providing maximum flexibility to states in solving the debt problems of municipalities in Chapter 9 and (3) irreparable harm will occur

to the TRANS holders from the County's failure to make the required Set–Asides.

As to the last contention, based on Sachs' projections, the Movants argued that unless the Set–Asides were made, the County would have insufficient revenues to pay the TRANS holders, including the Movants, on the July 1, 1995 maturity date. Moreover, because of certain California constitutional limitations, there was a substantial risk that the County would be unable to use revenues from subsequent years to satisfy the TRANS.[6]

Based on the evidence and the law, I treated the hearing as a preliminary hearing under Code § 362(e), found that the County would likely prevail at a final hearing, ordered the stay to continue in effect and set the matter for a final hearing.[7]

### DISCUSSION

■ Under Code § 362(d), this Court may grant relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of [a] party in interest." Movants contend that "cause" exists because the state court is the only forum that has the power to adequately protect its interest (i.e., the only forum that can compel the County to make the Set–Asides). Movants point out that Code § 904 limits the power of this court to order the County to make the Set–Asides.[8] Movants are wrong for two reasons.

---

**5.** The Code is set forth in 11 U.S.C. §§ 101–1330 (1994).

**6.** Article 16, § 18 of the Constitution of the State of California provides: "No county ... shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose...." In this case, there was no public vote approving the TRANS.

**7.** Section 362(e) provides in relevant part:

A hearing under this subsection may be a preliminary hearing, or may be consolidated with the final hearing under subsection (d) of this section. The court shall order such stay continued in effect pending the conclusion of the final hearing under subsection (d) of this section if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the conclusion of such final hearing....

**8.** Section 904 states:

Notwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with—
(1) any of the political or governmental powers of the debtor;
(2) any of the property or revenues of the debtor; or
(3) the debtor's use or enjoyment of any income-producing property.

The language of § 904 was contained in the Municipal Bankruptcy Act of 1937 (the "1937 Act"). 4 *Collier on Bankruptcy*, ¶ 904.01 at 904–01 (L. King 15th ed. 1994). The purpose of this provision was to circumvent any possible Tenth Amendment objection to municipal bankruptcy legislation. *Id.* The 1937 Act was upheld by the Supreme Court in *United States v. Bekins*, 304 U.S. 27, 51, 58 S.Ct. 811, 815, 82 L.Ed. 1137 (1938). The limitations imposed by § 904 were important to the *Bekins* Court, and it is unlikely that any municipal bankruptcy legislation could

First, the County has consented to this court's jurisdiction to order, if necessary, adequate protection in connection with this proceeding.

Second, §§ 361 [9] and 362, which respectively define the concept of adequate protection and its application, are specifically incorporated into Chapter 9 through Code § 901.[10] Congress obviously incorporated these specific sections into Chapter 9 to have purpose and effect. Because the court has the power to continue the stay in effect, it logically follows that the court must likewise have the power to order adequate protection as a condition for the continuance of the automatic stay. Otherwise, the application of § 362 in Chapter 9 would not make sense. The County has the choice of either complying with the court's order for adequate protection or having the stay lifted. This does not unduly encroach on the County's ability to conduct its affairs free from court interference. The County came into this court uninvited to obtain the benefit of the automatic stay. The price for retaining this benefit is the County's implied consent to this court's power to apply all of the provisions of § 362.

■ Moreover, § 904 is a general statute, whereas §§ 361 and 362 specifically address adequate protection. The general rule is

that specific statutory provisions control. *See, e.g., In re Khan,* 172 B.R. 613, 624 (Bankr.D.Minn.1994) ("Where both a specific and general statute address the same subject matter, the specific one takes precedence regardless of the sequence of enactment, and must be applied first.") (citations omitted); *Trustees of Amalgamated Ins. v. Geltman Industries,* 784 F.2d 926, 930 (9th Cir.1986) ("Fundamental maxims of statutory construction require that a specific statutory section qualifies a more general section and will govern, even though the general provisions, standing alone, would encompass the same subject.") (citations omitted).

Accordingly, both from the standpoint of the County's actual and implied consent to the application of § 362 in Chapter 9, this court has the power to order the County to provide the Movants with adequate protection as a condition for the continuance of the automatic stay. Appropriate relief is, therefore, not limited to the state court.

■ The next argument presented by the Movants is that granting relief from stay would further the Congressional policy of providing maximum flexibility to states in solving the debt problems of municipalities in Chapter 9. The Movants point out that Code 903 [11] is intended to maximize flexibility for

---

be passed without these limitations. 4 *Collier, supra,* ¶ 904.01 at 904–2.

**9.** Section 361 provides:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

**10.** Section 901(a) makes applicable to Chapter 9 all or portions of forty-six different sections of Chapters 3, 5, and 11 of the Code. These sections of the Code were carefully selected as being necessary or desirable to the conduct of a Chapter 9 case. 4 *Collier, supra,* ¶ 901.03 at 901–6.

**11.** Section 903 states:

This chapter does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality, including expenditures for such exercise, but—

(1) a State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition; and

(2) a judgment entered under such a law may not bind a creditor that does not consent to such composition.

The purpose of this provision is to remove any inference that Chapter 9 does anything more than provide a method for municipalities to adjust their indebtedness. 4 *Collier, supra,* ¶ 903.02 at 903–3. The legislative history of Chapter 9

the states in solving the debt problems of their municipalities.[12] The Movants conclude from this that § 903 dictates that the state court is the appropriate forum for resolution of the issues relating to the County's compliance with its contractual obligations to the TRANS holders.

■ The problem with the Movants' argument is that if they are correct, no municipality would file Chapter 9 because the benefits of filing would disappear. California specifically authorized its municipalities to seek the protection of Chapter 9.[13] The two main benefits of a Chapter 9 filing are (1) the breathing spell provided by the automatic stay, and (2) the ability to adjust debts of claimants through the plan process. If the automatic stay is to be lifted routinely to allow claimants to assert their claims in state court, a municipality will not have the time, opportunity or ability to confirm a plan. This certainly was not the policy or intent of Congress in providing debt relief for municipalities through Chapter 9. It likewise was not the intent of California in authorizing its municipalities to use Chapter 9. Accordingly, § 903 should not be interpreted to undercut the purpose and efficacy of Chapter 9.

Lastly, the Movants raise the question of irreparable injury. In effect, the Movants assert that this court must either lift the automatic stay and allow them to proceed in state court or provide the Movants with some form of adequate protection. The Movants claim that the failure of the County to make the Set–Asides causes them irreparable injury because most of the funds to which their lien attaches will be dissipated and given the County's abysmal financial condition, it is unlikely that the County will have sufficient funds to pay the TRANS on the July 1, 1995 maturity date.

■ To answer this question, the court must first decide if the Movants' lien survives post-petition. Under Code § 552(a), a pre-petition security interest does not reach property acquired by the debtor post-petition. *United Sav. Ass'n v. Timbers of Inwood Forest*, 484 U.S. 365, 374, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988). Section 552(a) is incorporated into Chapter 9 through § 901. In general, § 552(a) should be viewed broadly, given the goal of facilitating a fresh start for the debtor. *See generally Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934); *In re Transp. Design & Technology Inc.*, 48 B.R. 635, 640 (Bankr.S.D.Cal.1985). Accordingly, § 552(a) applies to all security agreements in Chapter 9, including those between municipalities and revenue bondholders.[14]

Prior to 1988, when a municipality filed Chapter 9, a risk existed that § 552(a) could strip revenue bondholders of their liens on post-petition property of the debtor. Code § 928[15] was enacted to remedy this problem

---

indicates that § 903 was crucial to the constitutionality of Chapter 9. In fact, the Supreme Court relied, in part, on the limitations imposed by § 903, when it upheld the constitutionality of the 1937 Act in *Bekins*, 304 U.S. at 51, 58 S.Ct. at 815. 4 *Collier, supra*, ¶ 903.02 at 903–2.

**12.** H.R. 595, 95th Cong., 1st Sess. 397–398 (1977).

**13.** Government Code § 53760 states:
Any taxing agency or instrumentality of this State, as defined in Section 81 of the act of Congress entitled "An act to establish a uniform system of bankruptcy throughout the United States," approved July 1, 1898, as amended, may file the petition mentioned in Section 83 of the act and prosecute to completion all proceedings permitted by Sections 81, 82, 83, and 84 of the act (footnotes omitted).

**14.** In general, municipalities issue two types of bonds, general obligation bonds and revenue bonds. David L. Dubrow, *Chapter 9 of the Bank-*

*ruptcy Code: A Viable Option for Municipalities in Financial Crisis?*, 24 Urb.Law. 539, 569 (Summer 1992). General obligation bonds are payable from the general revenues of a municipality and are backed by the full faith and credit of a municipality. *Id.* Municipalities are required to raise future tax levels to ensure that these bonds are paid. *Id.* State law typically imposes a limit on the amount of general obligation debt a municipality may issue and sometimes, general debt issuance requires voter approval. *Id.*

Revenue bonds are secured by a specific revenue source. For example, revenue bonds may be secured by a lien on tolls collected from a bridge whose construction was financed by issuance of those bonds. *Id.* In the event of a default, revenue bondholders have no right to payment from any other assets of the municipality. *Id.*

**15.** Section 928(a) provides: "Notwithstanding section 552(a) of this title and subject to subsection (b) of this section, special revenues acquired by the debtor after the commencement of the

by making § 552(a) inapplicable to revenue bonds.[16]

Section 928 was narrowly crafted to apply only to special revenue bonds. Congress could have made § 928 applicable to all municipal bonds, but it chose to limit its application. Section 552(a) is, therefore, still applicable to general revenue bonds like the TRANS.[17]

Because § 552(a) by its terms applies only to a security agreement that creates a security interest, the next question is whether the Movants' lien is a security interest created by a security agreement. A security agreement is an agreement that creates or provides for a security interest. Code § 101(50). A security interest is a lien created by an agreement. Code § 101(51). Section 552(a), therefore, only applies to liens created by a security agreement and not to other types of liens.[18]

In general, the three types of liens[19] are security interests, judicial liens[20] and statutory liens.[21] H.R. 595, 95th Cong., 1st Sess. 312 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 25 (1978). These liens are mutually exclusive and are exhaustive except for certain common law liens.[22]

The Supreme Court has divided these liens into two categories, voluntary (consensual) and involuntary (non-consensual). *United States v. Ron Pair Enterprises,* 489 U.S. 235, 240, 109 S.Ct. 1026, 1029–30, 103 L.Ed.2d 290 (1989). Consensual liens are created by an agreement between the debtor and creditor. In contrast, "involuntary liens, such as ... judicial or statutory liens ... are fixed by operation of law and do not require the consent of the debtor." *Id.; see also, Klein v. Civale & Trovato, Inc. (In re Lionel Corp.),* 29 F.3d 88, 94 (2d Cir.1994) (stating that liens created without consent are statutory liens). The fundamental difference, therefore, between a security interest and a statutory lien is the consent of the debtor to the granting of the lien.

The County issued the TRANS based on the authority granted to it under Government Code § 53852, which provides that "[A] local agency may borrow money pursuant to this article, such indebtedness to be represented by a note or notes...." The Movants' lien was granted pursuant to Government Code § 53856. Section 53856 states that "any taxes ... may be pledged to the payment ... of the notes.... The resolution authorizing the issuance of the note or notes shall specify what taxes ... are pledged for the payment thereof." Taken

---

case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."

**16.** The legislative history of the Bankruptcy Reform Act of 1988 indicates that Congress was concerned about potential conflicts between § 552(a) and both the Tenth Amendment and the Contracts Clause. S.Rep. No. 506, 100th Cong., 2d Sess. 6–7 (1988).

**17.** There is no disagreement that the TRANS are general obligation bonds that are not exempt from the application of § 552(a) under § 928(a).

**18.** *In re May Reporting Services, Inc.,* 115 B.R. 652, 657 (Bankr.D.S.D.1990) (section 552(a) applies only to liens arising from consensual security agreements and not to United States tax liens which are entirely statutory); *In re National Fin. Alternatives, Inc.,* 96 B.R. 844, 849 (Bankr. N.D.Ill.1989) (federal tax lien continues to attach to property acquired post-petition by debtor notwithstanding § 552(a)).

**19.** Code § 101(37) provides: " '[L]ien' means charge against or interest in property to secure

payment of a debt or performance of an obligation...."

**20.** Code § 101(36) provides: " 'Judicial lien' means lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding...." Judicial liens are not applicable to this proceeding because the Movant's lien did not arise through any legal or equitable proceeding.

**21.** Code § 101(53) provides:

"[S]tatutory lien" means lien arising solely by force of a statute on specified circumstances or conditions, or lien of distress for rent, whether or not statutory, but does not include security interest or judicial lien, whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute....

**22.** Common law liens are not specifically defined by the Code. Some examples include artisan and attorney retaining liens. *See Matter of Matassini,* 90 B.R. 508, 509 (Bkrtcy.M.D.Fla.1988). Common law liens are not relevant here.

together, these enabling provisions authorized the County to issue the TRANS and secure their payment by pledging certain revenues. The County had the choice to pledge its revenue stream to secure the TRANS. It did not have to pledge anything to borrow. In addition, in deciding to pledge revenues, it had to designate the specific revenues that were being pledged. The grant of the lien here was certainly not automatic. It required the consent of the County.

■ In contrast, the consent of the debtor is not necessary for borrowings under other statutory provisions. For example, Government Code §§ 53820–53833 govern temporary borrowings by any school district, county board of education, or community college. Section 53830 provides:

> The repayment of money borrowed by any school district, county board of education, or community college district constitutes a first lien and charge against the taxes, revenue and other income collected during the fiscal year in which the money was borrowed and shall be repaid from the first money received....

Under this statute, the lien is created automatically. The borrower does not have to agree to pledge revenues or identify the pledged revenues.

Another example of a temporary borrowing statute that creates a statutory lien is Government Code § 53840, which provides:

> [A County] may borrow on July 1st or thereafter such amounts as may be required to meet current obligations.... Amounts so borrowed shall be evidenced by notes ... and the liability created thereby shall be secured by a lien on all revenue to accrue to the county treasury

from any source during the year then in progress.

Again, the lien is automatic, and there is no need for any consent by the borrower or designation of revenues.

The Movants contend that their lien is not a security interest because (1) there is no written, bilateral agreement between the parties to create a lien[23] and (2) the lien is a statutory lien because it arises "solely by force of a statute on specified circumstances and conditions."

The Movants argue that under the statute the only document necessary for the grant of the lien was the Resolution. Of the three primary documents[24], the only document that contained language granting a lien was the Resolution and this is not an agreement between a debtor and creditor. As a matter of fact, at the time of the Resolution, the Contract with PaineWebber had not been signed. At best, the Movants argue the Resolution was a promise to issue the TRANS to a yet unidentified underwriter on certain terms and conditions.

■ The County responds that taken together the Resolution, Contract and TRANS constitute the agreement necessary to create a security interest. The County points out that a security agreement does not have to exist in one document. *Komas v. Future Systems, Inc.*, 71 Cal.App.3d 809, 139 Cal. Rptr. 669, 671 (1977). Rather, it is an accepted legal principle that multiple writings taken together may constitute a security agreement. *Id.*

■ The legislative history of the Code indicates that the term "security agreement" should be defined broadly.[25] A sepa-

---

**23.** The Resolution provides: "As security for the payment of the principal of and interest on the Notes the County hereby pledges and grants a first lien and charge against [certain unrestricted revenues]...."

The Contract provides: "[T]he underwriter hereby agrees to purchase ... and the County hereby agrees to sell ... $169,000,000 in ... 1994–95 Tax and Revenue Anticipation Notes, Series A.... The Notes shall be issued and secured pursuant to the provisions of the resolution of the County."

**24.** The three primary documents related to the consummation of the transaction were the Resolution, the Contract and the TRANS.

**25.** The Senate Report on the Bankruptcy Reform Act of 1978 provides:

> A Security Interest ... is a lien created by an agreement. Security Agreement is defined as the agreement creating the security interest. Though these terms are similar to the same terms in the Uniform Commercial Code, article IX, they are broader.... All U.C.C. security interests and security agreements are, howev-

rate formal document entitled "security agreement" is not necessary to create such an agreement. *M. Nolden v. Plant Reclamation (In Re Amex–Protein Development Corporation),* 504 F.2d 1056, 1058 (9th Cir. 1974). Instead, the question is whether the documents, taken as a whole, reflect an agreement to create a security interest. *Id.* at 1059; *Komas,* 139 Cal.Rptr. at 671.

In this case, the documents (the Resolution, Contract and TRANS), when viewed together, indicate that the parties intended to create a lien. The Resolution may be viewed as an offer to sell the TRANS, secured by a first lien and charge against certain revenues. This offer was then accepted by PaineWebber. Although the Contract does not contain any language specifically creating a lien, it specifically incorporates the granting language contained in the Resolution. Hence, an agreement, and not the statute, actually created the lien. Until acceptance occurred, no lien came into existence. The Movants' lien is a security interest because it depends on an agreement for its existence.

The lien is not statutory because it does not arise solely by force of the statute. The County had to decide to pledge its revenues and designate the specific revenues that would secure the TRANS.[26] Because the lien is a security interest, the lien terminates as to the County's post-petition revenues pursuant to § 552(a).

The last issue raised by the Movants is that the Code § 552(b)(1) exception to the cut off of a security interest applies here. As already stated, the general rule of § 552(a) is that a pre-petition security interest does not reach property acquired by the debtor post-petition. Section 552(b)(1) provides an exception for some proceeds, product, offspring or profits of encumbered property.[27] The Movants argue that even if its lien is a security interest, it survives post-petition under § 552(b)(1). Specifically, the Movants contend that the County pledged its right to a specific stream of taxes. Since the taxes collected are the proceeds or offspring from that stream, § 552(b)(1) excepts the tax revenues from the application of § 552(a).

The language of the Resolution and Contract belie this argument. Section 552(b)(1) applies to proceeds of encumbered property if (1) the parties entered into a pre-petition security agreement and (2) the security interest extends to pre-petition property of the debtor and proceeds of such property. *Philip Morris Capital Corporation v. Bering Trader, Inc. (In re Bering Trader, Inc.),* 944 F.2d 500, 501 (9th Cir.1991).

In this case, the Resolution clearly states that what was pledged was a first lien and charge against the first monies received by the County. Moreover, Government Code § 53856 states that the lien "shall be payable from the first moneys received by the local agency from, such pledged moneys." Neither the Resolution nor § 53856 make any reference to pre-petition property of the County. Section 552(b)(1), therefore, does

---

er, security interests and security agreements under this definition.
S.Rep. No. 989, 95th Cong., 2d Sess. 26 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5812.

**26.** Movants cite *Badger Mountain Irrigation Dist. Secured Bondholders' Comm. v. Badger Mountain Irrigation Dist. (In re Badger Mountain Irrigation Dist.),* 885 F.2d 606 (9th Cir.1989), for the proposition that the Ninth Circuit has already held that this type of lien is a statutory lien. In *Badger Mountain,* a case that did not involve § 552(a), the Ninth Circuit merely noted its agreement with the bankruptcy court's undisputed conclusion that the lien asserted by the bondholders was a statutory lien. *Id.* at 608 n. 2. This is not surprising because the Washington statute was a typical statutory lien provision which did not require consent but instead arose automatically upon all water rights and other property acquired by the irrigation district.

**27.** Section 552(b)(1) provides:

Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, or profits of such property, then such security interest extends to such proceeds, product, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

not except the pledged revenues on the TRANS from the application of § 552(a).

### CONCLUSION

In summary, this court has the power to grant appropriate relief under § 362. Congress did not intend § 903 to preclude this court from taking appropriate action to insure that the benefits of Chapter 9 are preserved for the County. The Movants have a security interest in the pledged revenues, and the lien is cut off on the County's post-petition revenues. Lastly, § 552(b)(1) does not apply here. Based on these conclusions, the Movants do not have an interest in the County's post-petition revenues, and no cause exists to lift the automatic stay or provide adequate protection. The Motion is denied.

This memorandum opinion shall supplement my findings of fact and conclusions of law in support of Order Denying Motion of Alliance Capital Management L.P. and Putnam Investment Management, Holders of Approximately $50 Million of County of Orange, California 1994–95 Tax and Revenue Anticipation Notes, Series A, For Relief From the Stays Under 11 U.S.C. §§ 362 and 922 to Seek Appropriate Relief in State Court.